J-S14001-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: E.M.P., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: R.L., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 3401 EDA 2019 |

Appeal from the Decree October 31, 2019
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-AP-0000487-2019

| | | |
|---|---|---|
| IN THE INTEREST OF: E.M.P., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: R.L., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 3402 EDA 2019 |

Appeal from the Order Entered October 31, 2019
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-DP-0000001-2018

BEFORE: BOWES, J., KING, J., and FORD ELLIOTT, P.J.E.

MEMORANDUM BY BOWES, J.: **FILED APRIL 21, 2020**

R.L. ("Mother") appeals the October 31, 2019 family court decree that

terminated involuntarily her parental rights to her son, E.M.P., and the order

entered the same date that changed the child's permanent placement goal.[1] We affirm.

E.M.P. was born in July 2017. Philadelphia Department of Human Services ("DHS") first became involved with the family on December 29, 2017, as a result of homelessness, concerns of child abuse and neglect, and Mother's severe mental health problems, including schizophrenia and paranoid hallucinations. There were no known family members to care for E.M.P. and Mother refused to disclose any information about the child's father, A.P.[2] ("Father"), with whom she had a history of domestic violence.

On January 12, 2018, the family court adjudicated E.M.P. dependent and referred Mother to the Clinical Evaluation Unit ("CEU") for a dual diagnosis evaluation and random drug screens. The court also referred Mother to the Achieving Reunification Center ("ARC") for services and domestic violence counseling. The initial placement goal was reunification. DHS placed E.M.P. in a general foster home through Bethany Christian Services, and identified a maternal aunt, who resides in Colorado, as a permanent kinship resource

_____

[1] This Court consolidated Mother's appeals *sua sponte*. We observe that the family court docket misdated the decree as August 16, 2019, two-and-one-half months before the hearing.

[2] By separate decrees entered on October 31, 2019, the family court involuntarily terminated the parental rights of Father and Unknown Putative Father. Neither Father nor Unknown Putative Father filed an appeal of the termination of parental rights or the goal change, nor have they participated in the instant appeals.

through an Interstate Compact on the Placement of Children ("ICPC"). The aunt travels to Philadelphia for weekend visits with E.M.P.

Following six periodic permanency review hearings between April 2018 and August 16, 2019, DHS filed petitions for the involuntary termination of parental rights pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), (8), and (b), and for a goal change. On October 31, 2019, the family court held a combined goal change/termination hearing. Mother was present and represented by counsel. The legal interest and best interests of then-two-year-old E.M.P. were represented by Stacey Tepe, Esquire.[3]

DHS presented the testimony of Shakina Sadiq, case manager for Community Umbrella Agency ("CUA") Turning Points for Children, and William Russell Ph.D., the psychologist who completed Mother's parenting capacity evaluation. The parties stipulated to Dr. Russell's expertise in forensic psychology. DHS further presented Exhibits 1 through 4, which were admitted.[4] We note that the visitation logs admitted as Exhibit 4 were admitted over objection and are the subject of Mother's final issue on appeal addressed *infra*. N.T., 10/31/19, at 7, 26-27, 72. At the close of evidence,

---

[3] **See In re T.S.**,192 A.3d 1080, 1089-90, 1092-93 (Pa. 2018) (reaffirming ability of attorney-guardian *ad litem* to serve dual role and represent child's best interests and legal interest where child is too young to communicate a preferred outcome).

[4] Dr. Russell's report, dated April 16, 2019, was admitted as DHS Exhibit 3.

the family court entered the above-referenced decree and order terminating Mother's parental rights and changing the permanent placement goal, respectively.

Mother filed timely notices of appeal,[5] along with concise statements of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). Mother raises the following issues for our review:

> 1.   The trial court erred as a matter of law and abused its discretion by involuntarily terminating [Mother's] parental rights pursuant to 23 Pa.C.S. § 2511(a)(1) in the absence of clear and convincing evidence that [Mother's] conduct evidenced a settled purpose to relinquish her parental claim, or a refusal or failure to perform parental duties, for at least [six] months preceding the filing of the petition.
>
> 2.   The trial court erred as a matter of law and abused its discretion by involuntarily terminating [Mother's] parental rights pursuant to 23 Pa.C.S. § 2511(a)(2) in the absence of clear and convincing evidence that [Mother's] repeated or continued incapacity caused the child to be without parental care and control, and that [Mother] could not or would not remedy the incapacity.
>
> 3.   The trial court erred as a matter of law and abused its discretion by involuntarily terminating [Mother's] parental rights pursuant to 23 Pa.C.S. § 2511(a)(5) and 23 Pa.C.S. § 2511(a)(8) in the absence of clear and convincing evidence that the conditions which led to the child's placement continued to exist and cannot or will not be remedied within a reasonable period of time.
>
> 4.   The trial court erred as a matter of law and abused its discretion by terminating [Mother's] parental rights pursuant to 23 Pa.C.S. §§ 2511(a)(5), (8), and (b) in the absence of clear and

---

[5] Mother's appeals were required to be filed by November 30, 2019, which was a Saturday.  Hence, the notices of appeal filed on Monday, December 2, 2019, were timely.  **See** 1 Pa.C.S. §1908(2) (providing for the omission of the last day of time which falls on weekend or legal holiday).

convincing evidence that termination would best serve the child's needs and welfare.

5. The trial court erred as a matter of law and abused its discretion by changing the permanency goal to adoption in the absence of clear and convincing evidence that adoption would best serve the child's needs and welfare.

6. The trial court erred as a matter of law and abused its discretion by allowing a sample of visitation logs to be admitted into evidence over Mother's objections on the basis of hearsay and the rule of completeness.

Mother's brief at 3-4.

Our standard of review is as follows:

The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (cleaned up).

The termination of parental rights is governed by § 2511 of the Adoption Act, 23 Pa.C.S. §§ 2101-2938, and requires a bifurcated analysis of the grounds for termination followed by the needs and welfare of the child.

Our case law has made clear that under [§] 2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in [§] 2511(a). Only if the court determines that the parent's conduct warrants termination of his

or her parental rights does the court engage in the second part of the analysis pursuant to [§] 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa.Super. 2007) (citations omitted). We have defined clear and convincing evidence as that which is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *In re C.S.*, 761 A.2d 1197, 1201 (Pa.Super. 2000) (*en banc*) (quoting *Matter of Adoption of Charles E.D.M., II*, 708 A.2d 88, 91 (Pa. 1998)).

In the case *sub judice*, the family court terminated Mother's parental rights pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), (8), and (b). We need only agree with the family court as to any one subsection of § 2511(a), as well as § 2511(b). *See In re B.L.W.*, 843 A.2d 380, 384 (Pa.Super. 2004) (*en banc*). Here, we analyze the court's termination decree pursuant to § 2511(a)(2) and (b), which provide as follows:

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> . . . .
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

- 6 -

. . . .

> **(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.

23 Pa.C.S. § 2511(a)(2), and (b).

With regard to termination of parental rights pursuant to § 2511(a)(2), we have indicated:

> In order to terminate parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2), the following three elements must be met: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

*In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa.Super. 2003) (citation omitted). "The grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct. To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties." *In re Adoption of C.D.R.*, 111 A.3d 1212, 1216 (Pa.Super. 2015) (quoting *In re A.L.D.*, 797 A.2d 326, 337 (Pa.Super. 2002)). "Parents are required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities. . . . [A] parent's vow to cooperate, after a long period of uncooperativeness regarding the necessity or availability of

- 7 -

services, may properly be rejected as untimely or disingenuous." *In re A.L.D.*, 797 A.2d at 340 (internal quotation marks and citations omitted).

In finding that DHS established the statutory grounds to terminate Mother's parental rights pursuant to § 2511(a)(2), the family court concluded that Mother's marginal compliance with the court-ordered goals was inadequate to remedy the parental incapacity precipitated by her severe mental health problems. In addition to noting Mother's successful completion of domestic violence and parenting courses in 2018, the family court identified Mother's failures relating to employment and housing, her disinterest in mental health treatment, her difficulty managing and administering E.M.P.'s medication, and her intermittent participation in the supervised visitations.

As it relates to mental health and visitation, the family court addressed Mother's shortcomings thoroughly in its opinion entered on December 23, 2019. For instance, the court highlighted that "Mother has previously stated that she does not suffer from any psychiatric disorder, but instead suffers from "spiritual schizophrenia," which was due to the "devil and spirits." Family Court Opinion, 12/23/19, at 10. Similarly, it noted, "[Dr. Russell] determined that Mother did not have the capacity to provide safety and permanency to [E.M.P.] . . . As part of the [evaluation], [Dr. Russell] completed a psychological test on Mother and the results were consistent with delusional disorder and a mood disorder." *Id*. at 8-9. Further, the court stressed that "Mother's [current] treatment . . . is not sufficiently able to address Mother's mental health concerns." *Id*. at 11.

Likewise, regarding the supervised visitations, the family court

observed,

> Throughout the life of the case, Mother missed 21 out of 70 [weekly supervised] visits with [E.M.P.]. On multiple occasions, Mother arrived late to visits, which necessitated a requirement that Mother had to be present for the visit one hour prior to the start of the visit. On [other] occasions, the visit was cancelled because Mother failed to call and confirm the visit 24 hours in advance. Mother never graduated beyond supervised visits at the agency due to Mother's inconsistency with her mental health objective. . . . . Mother has not attended any of [E.M.P.]'s medical appointments. There are concerns regarding Mother's understanding of [E.M.P.]'s diagnosis[.] Further, Mother has stated that she believes the "lord" will determine when medication is needed, which can be dangerous for [E.M.P.] because he requires his medication for his well-being.

*Id*. at 12.

The court summarized the effects of these conditions on E.M.P. as

follows,

> At the permanency review hearing on August 16, 2019, Mother was determined to be minimally compliant with the permanency plan. [E.M.P.] needs permanency and Mother has demonstrated that she is unwilling to provide [E.M.P.] with essential parental care, control, or subsistence necessary for his physical and mental well-being. Mother has refused to remedy the conditions and causes of Mother's incapacity by failing to fully engage in her . . . objectives. Mother had ample opportunity to put herself in a position to parent. Mother's repeated and continued incapacity has not been mitigated for the life of the case. Termination under 23 Pa.C.S.A. §2511(a)(2) was also proper.

*Id*. at 10-12.

Mother contends that the evidence failed to establish her incapacity and

inability to parent E.M.P. Mother's brief at 16-17. She argues,

> While Dr. Russell stated that Mother's history and presentation "reflects [sic] inconsistency in treatment," there was no specific

- 9 -

exploration of how Mother's [behavior] meant that she was unable to provide safety and permanency to her child. To the contrary, the testimony showed that Mother was employed, she had obtained a housing voucher, and that she was taking her prescribed medication.

Moreover, the testimony did not show that any [parental] incapacity cannot or will not be remedied. On the contrary, the testimony showed Mother's mental health condition was amenable to treatment. The record as a whole reveals Mother's persistent commitment to appropriate care and to stabilizing her mental health.

*Id*. at 17 (citations omitted).

As discussed, *infra*, the certified record supports the family court's finding of the statutory grounds for termination under § 2511(a)(2). It reveals that Mother failed to complete the objectives aimed at reunification with E.M.P. and, most notably, neglected the persistent concerns about her mental health, which was the reason for E.M.P's. placement. N.T., 10/31/19, at 12, 14-16, 18-22, 41-44. Further, Mother was not capable of providing E.M.P. safety and permanency. *Id*. at 61-62.

As reported by Shakina Sadiq, CUA case manager, Turning Points for Children, Mother's objectives upon completing the parental evaluation were to obtain stable housing and employment, comply with recommendations as to mental health treatment and medication, sign consents, and confirm visitation twenty-four hours in advance. *Id*. at 18. Significantly, although, at the time of the evidentiary hearing, Mother had been engaged in mental health treatment for approximately two months, her prior participation proved unsuccessful. *Id*. at 14-15. Moreover, Ms. Sadiq testified that Mother was not currently attending treatment as recommended, having missed several

weeks of treatment in September 2019, and when Mother did participate, she attended only once per week, as opposed to the recommended allotment of four sessions per week in October 2019. *Id*. at 41-44. While Ms. Sadiq further testified that Mother informed her that she was taking her medication, Mother did not document her compliance and indicated that "the Lord will tell her when she doesn't need to take [medicine] anymore." *Id*. at 16, 22. Ms. Sadiq likewise confirmed that Mother did not believe that she suffered from a psychotic disorder, but rather "spiritual schizophrenia" due to the "devil and spirits." *Id*. at 44. Similarly, while Ms. Sadiq indicated that Mother was, in fact, trained in the administration of E.M.P.'s medication, the caseworker was troubled by Mother's opinion of the medication insofar as Mother believed that "the Lord will say when the medication isn't needed, and [whether E.M.P.] really needs his medication for his well-being." *Id*. at 46-47.

As indicated by Ms. Sadiq, Mother additionally failed to secure housing and, prior to obtaining employment on October 9, 2019, had been unemployed for nineteen months. *Id*. at 18-22. Similarly, as to visitation, Mother was "inconsistent," missing twenty-one of seventy supervised visitations and appearing late when she did attend. *Id*. at 24. Notably, Ms. Sadiq testified that Mother had missed three visits since the last court hearing, twice failing to confirm in advance. *Id*. at 29-30. Furthermore, when asked why the visitations never progressed beyond supervision, Ms. Sadiq responded, "CUA felt like, due to mom's inconsistency in her mental health, that she wasn't ready for the next visitation . . . ." *Id*. at 30. As a result, Dr. Russell, who

conducted the parenting evaluation, opined that Mother was not capable of providing E.M.P. safety and permanency. *Id*. at 61-62.

As evidenced by Ms. Sadiq's testimony regarding Mother's inadequate compliance with her goals, the certified record substantiates the family court's conclusion that Mother's repeated and continued incapacity, abuse, neglect, or refusal has caused E.M.P. to be without essential parental control or subsistence necessary for his physical and mental well-being. *See In re Adoption of M.E.P.*, *supra* at 1272. Stated plainly, despite ample opportunity to remedy her mental health problems and parenting deficiencies, Mother's incapacity continues to deny E.M.P. the necessary parental care.

We next determine whether termination was proper under § 2511(b). As to § 2511(b), our Supreme Court described this analysis as follows:

> [I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability." *In re K.M.*, 53 A.3d 781, 791 (Pa.Super. 2012). In *In re E.M.*, [620 A.2d 481, 485 (Pa. 1993)], this Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond. *In re K.M.*, [*supra*] at 791. However, as discussed below, evaluation of a child's bonds is not always an easy task.

*In re T.S.M.*, *supra* at 267. "In cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists. The extent of any bond analysis, therefore, necessarily depends on the

- 12 -

circumstances of the particular case." *In re K.Z.S.*, 946 A.2d 753, 762-63 (Pa.Super. 2008) (citation omitted).

When evaluating a parental bond, "the court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as well. Additionally, § 2511(b) does not require a formal bonding evaluation." *In re Z.P.*, *supra* at 1121 (internal citations omitted).

Moreover,

While a parent's emotional bond with his or her child is a major aspect of the [§] 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.

[I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. . . .

*In re Adoption of C.D.R.*, 111 A.3d at 1219 (quoting *In re N.A.M.*, 33 A.3d 95, 103 (Pa.Super. 2011)) (quotation marks and citations omitted).

In finding that terminating Mother's parental rights pursuant to § 2511(b) serves E.M.P.'s emotional needs and welfare, the family court reasoned that Mother's lackluster attendance record, inability to progress beyond supervision, and misunderstanding of E.M.P.'s health diagnosis evinced her lack of commitment to her son's developmental and physical wellbeing. In addition, the court observed that E.M.P. does not exhibit an emotional bond with Mother. Instead, he is bonded with his foster parent and,

to a lesser extent, his pre-adoptive resource, the maternal aunt. The court noted,

> [E.M.P.] has been placed in this foster home for the life of the case and [E.M.P.] share[s] a beneficial parental bond with the foster parent. [E.M.P.] looks to the foster parent for his basic needs and comfort. [E.M.P.] also has a kinship resource available through Maternal Aunt[, whom he visits on the weekends]. . . . Mother and [E.M.P.] do not share a parent-child bond. Although [E.M.P.] can recognize Mother at the supervised visits, Mother and [E.M.P.] share a bond that resembles an aunt-cousin bond. [E.M.P.] does not ask about Mother. [E.M.P.] would not suffer any irreparable harm if Mother's parental rights were terminated and it is in [E.M.P.]'s best interest to be freed for adoption. The record establishes by clear and convincing evidence that termination would not sever an existing and beneficial relationship with Mother. The DHS witnesses were credible. The trial court's termination of Mother's parental rights to [E.M.P.] under 23 Pa.C.S.A. § 2511(b) was proper and there was no error of law or an abuse of discretion.

Family Court Opinion, 12/23/19, at 20-21 (citations to record omitted).

Mother argues that the family court ignored evidence of a bond between Mother and E.M.P. *See* Mother's brief at 20. She highlights the court's recognition of her love of E.M.P. but contends that the court discounted her positive interactions with E.M.P. during the visitations. *Id*. at 20-21.

Again, we discern no abuse of discretion. The record supports the family court's finding that E.M.P.'s developmental, physical, and emotional needs and welfare favor terminating Mother's parental rights pursuant to § 2511(b). Critically, Ms. Sadiq explained that E.M.P. did not share a parental bond with Mother, but rather evidenced such a bond with his maternal aunt, the pre-adoptive resource foster mother. Ms. Saqiq testified as follows:

- 14 -

MS. FARIS: Okay. And how -- how would you describe the relationship between [E.M.P.] and his mother?

MS. SADIQ: [E.M.P.] does know who his mom is. He interacts with her, but it's not, like, a mother -- parent bond; it's more so like an aunt-cousin relationship.

MS. FARIS: And what makes you say that?

MS. SADIQ: From my interactions at the house. It's different, the way he interacts with the foster mother that's been with for almost 19 -- 19 months, versus mom. With the foster mother, it's more -- he runs to her for comfort – want[s] to lay on her.

. . .

MS. SADIQ: . . . With mom, he interacts with her, and he plays with mom, but it's not to a comfort level.

N.T., 10/31/19, at 30-31. In support of Mother's lack of a parental bond with E.M.P., Ms. Sadiq further indicated that E.M.P. did not cry upon separation from Mother at the end of visitation and did not ask for Mother. *Id*. at 31, 40. Ms. Sadiq likewise confirmed that visitation between E.M.P. and his maternal aunt went well, and that E.M.P. asked for his maternal aunt. *Id*. at 38, 40. As a result, Ms. Sadiq opined that she did not believe that E.M.P. would suffer irreparable harm if Mother's parental rights were terminated. *Id*. at 32. She explained, "Because he doesn't look to mom for his basic needs, for comfort when he's sick; he looks towards his foster parent, and it's not a mother-child bond." *Id*. Ms. Sadiq testified that it would be in E.M.P.'s best interests to be freed for adoption. *Id*. at 40.

While Mother may profess to love E.M.P., a parent's own feelings of love and affection for a child, alone, will not preclude termination of parental rights.

- 15 -

*In re Z.P.*, *supra* at 1121. At the time of the hearing, E.M.P. had been in placement for approximately nineteen months, and he is entitled to permanency and stability. A child's life "simply cannot be put on hold in the hope that [a parent] will summon the ability to handle the responsibilities of parenting." *Id*. at 1125. Rather, "a parent's basic constitutional right to the custody and rearing of his child is converted, upon the failure to fulfill his or her parental duties, to the child's right to have proper parenting and fulfillment of his or her potential in a permanent, healthy, safe environment." *In re B.,N.M.*, 856 A.2d 847, 856 (Pa.Super. 2004) (citation omitted). Accordingly, for the foregoing reasons, we find that the family court did not abuse its discretion in terminating Mother's parental rights involuntarily pursuant to 23 Pa.C.S. § 2511(a)(2) and (b).

We next address whether the family court appropriately changed the permanency goal to adoption. Mother contends that the goal change to adoption was improper because the ICPC with Colorado was still pending, and "Changing the Child's goal to adoption before the adoptive resource was finalized cannot be in the Child's best interests." Mother's brief at 23. This issue is arguably moot in light of our decision to affirm the court's termination decree. *In re D.R.-W.*, ___ A.3d ___, 2020 WL 465686 at 9 (Pa.Super. Jan. 29, 2020) (noting mootness in addressing merits of parent's challenge to goal change following termination of parental rights). Nevertheless, as Mother's challenge relates to whether the goal change **to** adoption is best suited to her

- 16 -

son's welfare, as opposed to challenging the change **from** family reunification, we address the merits of that issue.

We review the court's goal change order determination for an abuse of discretion. *See In re S.B.*, 943 A.2d 973, 977 (Pa.Super. 2008) ("In cases involving a court's order changing the placement goal from 'return home' to adoption, our standard of review is abuse of discretion.") Further,

> Pursuant to [42 Pa.C.S.] § 6351(f) of the Juvenile Act, when considering a petition for a goal change for a dependent child, the juvenile court is to consider, *inter alia:* (1) the continuing necessity for and appropriateness of the placement; (2) the extent of compliance with the family service plan; (3) the extent of progress made towards alleviating the circumstances which necessitated the original placement; (4) the appropriateness and feasibility of the current placement goal for the children; (5) a likely date by which the goal for the child might be achieved; (6) the child's safety; and (7) whether the child has been in placement for at least fifteen of the last twenty-two months. The best interests of the child, and not the interests of the parent, must guide the trial court. As this Court has held, a child's life simply cannot be put on hold in the hope that the parent will summon the ability to handle the responsibilities of parenting.

*In re A.B.*, 19 A.3d 1084, 1088-89 (Pa.Super. 2011) (citations and quotation marks omitted).

Additionally, Section 6351(f.1) requires the family court to make a determination regarding the child's placement goal:

> **(f.1) Additional determination.**—Based upon the determinations made under subsection (f) and all relevant evidence presented at the hearing, the court shall determine one of the following:
>
> . . . .

- 17 -

> (2) If and when the child will be placed for adoption, and the county agency will file for termination of parental rights in cases where return to the child's parent, guardian or custodian is not best suited to the safety, protection and physical, mental and moral welfare of the child.

42 Pa.C.S. § 6351(f.1).

Upon review of the record, we discern no abuse of discretion. Notwithstanding the fact that the anticipated ICPC was not finalized as of the date of the goal change hearing, the record reveals that changing the permanency goal to adoption served E.M.P.'s best interests.

First, we observe that the Juvenile Act does not require an agency to present a confirmed adoptive resource prior to seeking a goal change to adoption. It must simply demonstrate that the change aligns with the five factors outlined in § 6351(f). Instantly, DHS established that (1) adoption is an appropriate placement goal; (2) Mother did not fully comply with the reunification goals; (3) Mother did not alleviate the circumstances which necessitated the original placement; (4) reunification is an inappropriate goal; and (5) although the ICPC had not garnered final approval, it is anticipated. In this vein, we note that Mother did not identify any defects in the proposed interstate compact.

Moreover, even if the ICPC transfer is derailed for some unforeseen reason, the family court maintains discretion to alter the goal pursuant to § 6351(f) and (f.1) in order to serve E.M.P.'s best interest. For example, observing that E.M.P. is thriving in his current foster home, if kinship placement with the maternal aunt cannot be achieved for any reason, the

family court may determine that the foster home is an alternate source of permanence and change the goal accordingly. As the record supports that the goal change was in E.M.P.'s best interest, the family court did not abuse its discretion in granting DHS's petition to change E.M.P.'s permanent placement goal to adoption before the ICPC was completed.

Finally, Mother argues that the family court erred and/or abused its discretion in admitting only a portion of the visitation logs, which was entered as Exhibit 4. Mother's brief at 23-24. Invoking Pa.R.E. 106, Mother asserts that the exhibit, which logged seven of the seventy visits between Mother and E.M.P., was "woefully incomplete" and "provided a misleading impression of the quality of visits and Mother's bond with her son." *Id*. at 24. Mother claims that the court should have barred the exhibit or, alternatively, directed DHS to introduce all of the logs into evidence. *Id*.

The following principles inform our review:

> [T]he decision of whether to admit or exclude evidence is within the sound discretion of the orphans' court. A reviewing court will not disturb these rulings absent an abuse of discretion. Discretion is abused if, *inter alia*, the orphans' court overrides or misapplies the law.

*In re A.J.R.-H.*, 188 A.3d 1157, 1166–67 (Pa. 2018).

Pursuant to Pa.R.E. 106, "If a party introduces all or part of a writing or recorded statement, an adverse party may require the introduction, at that time, of any other part--or any other writing or recorded statement--that in fairness ought to be considered at the same time." Pa.R.E. 106. Significantly, however, as we stated in *Commonwealth v. Bryant*, 57 A.3d 191, 195

(Pa.Super. 2012), "'Rule 106 is not an exclusionary rule, but, rather, it merely permits the adverse party to introduce related writings so that the documents originally introduced are not read out of context . . . . [T]he rule's primary purpose is to correct misleading or impartial [*sic*] evidence.'" (quoting ***Commonwealth v. Passmore***, 857 A.2d 697, 712 (Pa.Super. 2004) (internal citation omitted)) (brackets in original).

> As to this issue, the family court stated,

> [U]nder the completeness rule, Mother's objection to the visitation logs, whether the trial court sustained or overruled Mother's objection, should not have resulted in an exclusion of the visitation logs. The visitation logs entered into evidence at the termination and goal change trial were each entered in their entirety with no redactions, but only the visitation logs of certain dates were entered into the record. . . . [Significantly,] Mother . . . did not attempt to submit visitation logs from other dates into the record. Since the completeness rule is not an exclusionary rule, the trial court properly overruled Mother's objection to exclude the visitation logs from evidence.

Family Court Opinion, 12/23/19, at 25-26.

We agree with the trial court's reasoning. Rule 106 is not exclusionary and Mother did not attempt to introduce any related writings so that the seven complete logs that DHS introduced were not read out of context. She simply complained that DHS did not include the logs of sixty-three other visits. However, contrary to Mother's contentions that DHS was required to introduce the remaining visitation logs, which may not have been germane to its case-in-chief, Rule 106 does not mandate DHS to enter evidence on Mother's behalf. Indeed, in presenting her case, Mother either declined or neglected to

introduce the other sixty-three visitation logs, which DHS stresses were made available to her. Accordingly, the court did not abuse its discretion in overruling Mother's objection.

For all of the foregoing reasons, we affirm the family court decree and order terminating Mother's parental rights under 23 Pa.C.S. § 2511(a)(2) and (b) and changing E.M.P.'s permanent placement goal to adoption, respectively.

Decree and order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 04/21/2020